Heather ISABELLE

v.

John L. MANSFIELD, Chief Probation Officer; and Elizabeth Halloran, Probation Officer.

Civil Action No. 06–10923–RGS.

United States District Court, D. Massachusetts.

July 10, 2008.

Michele R. Moretti, Law Office of Michele R. Moretti, Boston, MA, for Petitioner.

Randall E. Ravitz, Office of the Attorney General, Trial Division, Boston, MA, for Respondents.

### MEMORANDUM AND ORDER ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

STEARNS, District Judge.

■ This petition raises a substantial issue involving prosecutorial error under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[1] As Magistrate Judge Dein explained, the debate over whether the error in the context of the trial as a whole merited a reversal of petitioner's conviction split the Massachusetts Supreme Judicial Court (SJC) into two sharply divided blocs. As the 4–3 vote of the SJC affirming petitioner's conviction illustrates, the result could well have been different. One might reasonably think that the majority of the SJC was wrong in affirming petitioner's conviction—although like Magistrate Judge Dein I think it was not. But for purposes of habeas review, the issue is not whether the majority of the Court wrongly applied established fed-

---

1. Like the Magistrate Judge, I see no merit in petitioner's second claim with respect to the lack of an instruction on specific unanimity. The claim has no support in federal or state law, much less support under the United States Constitution.

eral law, but whether the application was unreasonable. *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). It was not.[2] Consequently, the recommendation of the Magistrate Judge is ADOPTED and the petition is DISMISSED. The Clerk may now close the case.

SO ORDERED.

### REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254

DEIN, United States Magistrate Judge.

## I. INTRODUCTION

The petitioner, Heather Isabelle ("Isabelle" or "defendant"), was convicted on February 1, 2001 by a Bristol County Superior Court jury of charges of assault and battery on a child under the age of fourteen years causing substantial bodily injury (Mass. Gen. Laws ch. 265, § 13J[*b*]), and assault and battery with a dangerous weapon (Mass. Gen. Laws ch. 265, § 15A[*b*]). She was sentenced to five years incarceration in State prison for the assault and battery with a dangerous weapon conviction, and to ten years of probation for the assault and battery on a child, with probation to run from and after incarceration. Her conviction was affirmed by the Massachusetts Appeals Court in an unpublished opinion, *Commonwealth v. Isabelle,* 60 Mass.App.Ct. 1117, 803 N.E.2d 1288, 2004 WL 287364 (2004) (*"Isabelle I"*). The Massachusetts Supreme Judicial Court ("SJC") allowed Isabelle's petition for further appellate review as to one claim, and affirmed the conviction, but with three justices dissenting. *Commonwealth v. Isabelle,* 444 Mass. 416, 828 N.E.2d 53 (2005) (*"Isabelle II"*).

This matter is presently before the court on Isabelle's timely petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. By this petition, Isabelle contends that (1) the prosecutor's elicitation of testimony that Isabelle requested an attorney when questioned by police violated her constitutional rights and constituted reversible error, and (2) Isabelle's trial counsel's failure to request a unanimity instruction in order to prevent juror confusion constituted ineffective assistance of counsel. The first issue is the one addressed by both the Appeals Court and the SJC. This court finds that the state court decisions rejecting Isabelle's contentions with respect to both of her claims were neither contrary to, nor an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court. Therefore, and for the reasons detailed more fully herein, this court recommends to the District Judge to whom this case is assigned that Isabelle's Petition for Writ of Habeas Corpus be DENIED.

## II. STATEMENT OF FACTS [3]

### The Underlying Crime

Isabelle's convictions arise from abuse injuries sustained by her then two-year old

---

**2.** The Magistrate Judge was right to rely on *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), in reaching her conclusion that no constitutional violation occurred at all. However, like the Justices, both those in the majority and those who dissented, I am of the view that a constitutional violation did occur. Nonetheless, I agree with the majority opinion that the violation was of no "substantial or injurious ef-

fect," given its fleeting nature and the trial judge's immediate and emphatic action in striking the offending comment. *See Brecht v. Abrahamson,* 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

**3.** The respondent has submitted the record below in a Supplemental Appendix ("SA") filed as Docket Nos. 8 (Exs.A–M) and 9

daughter, Holly, sometime during the period May 12–25, 1999. *Isabelle II*, 444 Mass. at 417, 828 N.E.2d at 55. The critical question of fact that the jury had to decide was whether those injuries were caused by Isabelle or by a neighbor, Heidi Niemic (or someone in Niemic's household), in whose care Holly had been entrusted. The facts, as described by the state courts, were as follows:

On April 16, 1999, the Department of Social Services ("DSS") removed Holly and her two young sisters from the home that Isabelle shared with the girls' father, William Niemic. *Id.* at 417, 828 N.E.2d at 55. Holly was returned to the home on April 30, 1999, while her sisters remained in foster care. *Id.* at 417 n. 2, 828 N.E.2d at 55 n. 2. Jacqueline Green ("Green"), the social worker assigned to the case, attempted to see the victim three days after her return, but the defendant refused to let her see the child. *Id.* at 417, 828 N.E.2d at 55. Between April 30 and May 24, Green was unable to see the victim. *Id.* There was evidence at trial, although disputed by Isabelle, that Isabelle told Green and an investigator with DSS that Holly was at her maternal grandfather's home in Rhode Island during this period. *Id.* At trial, Isabelle testified that Holly was at the home of Heidi Niemic ("Niemic") from May 12 until May 25, when Green and Isabelle picked her up for a meeting with Isabelle's attorney. *Id.* at 417–18, 828 N.E.2d at 55–56. Niemic is William Niemic's niece. *Id.* at 417 n. 4, 828 N.E.2d at 55 n. 4. According to Isabelle, Niemic was taking care of Holly because William Niemic had raped and beaten Isabelle on May 11th, for which he

was arrested, and Niemic had offered to watch Holly for a few days because Isabelle was "really hurt from what Billy had done." (Tr. (SA Ex. O) at II:50–51).

Niemic denied that Holly was in her care from May 12 through May 25. Rather, she testified that the victim was in her care from May 20 until the morning of May 23, 1999, when Holly was returned to her mother, and then again from the evening of May 23 until May 25, when Isabelle and Green picked her up. *Isabelle II*, 444 Mass. at 417–18, 828 N.E.2d at 55. Isabelle denied having her child with her on May 23, and there was corroborating testimony from a neighbor that Isabelle was with the neighbor most of that day attending another neighbor's cookout, and that Holly was not there. *Id.* (*See* Tr. II:87–90).[4]

According to Niemic, when giving Holly a bath on May 20th she noticed a bruise on the victim's face and teeth marks on Holly's inner thighs. (Tr. I:75–76). *Isabelle II*, 444 Mass. at 418, 828 N.E.2d at 55. She stated that although she was concerned and contacted DSS, she did not file a report because she did not want to "get involved." *Isabelle II*, 444 Mass. at 418, 828 N.E.2d at 55. Niemic then testified that after Isabelle returned with Holly on the afternoon of May 23, she noticed blisters and bruises on Holly's body, a red mark in one of her eyes, and that Holly was acting uncharacteristically lethargic. *Id.*

Isabelle and Green picked Holly up at Niemic's apartment on May 25 for a meeting with Isabelle's attorney. *Id.* at 418,

---

(Exs.N–P). Under 28 U.S.C. § 2254(e)(1), the state trial and appellate courts' findings of facts are entitled to a presumption of correctness. *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir.2002); *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir.2002), *cert. denied*, 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003).

4. There was also testimony supporting a conclusion that Isabelle was a loving parent. (*See generally* Pet. Mem. (Docket No. 2) at 16–17).

828 N.E.2d at 55–56. Isabelle was in the process of attempting to regain custody of her children from DSS. *Id.* at 420, 828 N.E.2d at 57. At that time, Green noticed some of the injuries. *Id.* at 418, 828 N.E.2d at 56. Green testified that when she asked Niemic what had happened, Niemic said the victim "took a digger." *Id.* Niemic, however, testified that when she said this she was lying because she "was trying to cover" for Isabelle. *Id.* at 418 n. 5, 828 N.E.2d at 56 n. 5. Green further testified that Isabelle showed no reaction to Holly's injuries until she was told that they were taking the child to the hospital. *Id.* at 418, 828 N.E.2d at 56.

Once at the hospital, Green took the victim into the emergency room because Isabelle did not move out of the car. *Id.* There was testimony by a police officer that Isabelle wanted to leave the hospital. *Id.* For her part, Isabelle testified that she was told to leave the hospital because there was a court order barring her from seeing Holly. *Id.* at 419 n. 10, 828 N.E.2d at 56 n. 10. However, no evidence of a court order was introduced at trial. *Id.*

Holly was admitted to the hospital with serious injuries, including various bruises that were in different stages of healing, bleeding between the brain and skull which apparently had resulted from a violent shaking episode one to two weeks earlier, a hemorrhage in her eye which the doctor estimated had resulted from a violent shaking episode less than one week before the examination, red marks on her skin, injury to her scalp which indicated that her hair had been pulled out, and nine lesions consistent with cigarette burns. *Id.* at 418 & nn. 7–8, 828 N.E.2d at 56 & nn. 7–8. As evidenced by their stages of healing, the doctor was of the opinion that some of the bruises had been sustained two to three days before, while others were approximately seven to ten days old. *Id.* at 418 n. 6, 828 N.E.2d at 56 n. 6.

### Questioning at Trial

Before Isabelle's trial, defense counsel successfully brought a motion in limine to preclude the admission of evidence that Isabelle had requested an attorney during her interrogation by police. *Isabelle II,* 444 Mass. at 418–19, 828 N.E.2d at 56. The court allowed defendant's request that the police witnesses not be asked what question they had asked Isabelle immediately before she requested to speak with her attorney, i.e., "I asked her if she ever harmed [the victim]." *Id.* at 419 n. 11, 828 N.E.2d at 56 n. 11. Nevertheless, during direct examination of the detective, the prosecutor elicited the exact testimony barred by the pretrial ruling. *Id.* at 419, 828 N.E.2d at 56. Defense counsel's objection was sustained and the reference was stricken. *Id.* No curative instruction was requested and none was given. *Id.* Specifically, the questioning of the police witness concerning Isabelle's interview (following testimony to the effect that she was given her Miranda warnings) was as follows:

Q. What did you say to her?

A. I was asking her if she was mentally—if she had any mental illness, if she was on any type of drugs, if there was anything that could stop her from answering correct answers to me or—

Q. All right. What did she respond to those questions?

A. She said she had no mental illness, and she said that she did not take drugs or alcohol.

Q. Okay. After she told you that, what did she say to you, or what did you say to her?

A. *I asked her if she knew what happened to her baby or if she harmed her baby.*

Q. *And what did she say?*

A. *She said she wanted her lawyer.*

*Mr. Coyne: Objection.*

*Court: Yes. Sustained. Stricken. It's stricken.*

Q. Did—in regards to the injuries to her child, did she indicate anything to you about how those injuries occurred? Did she say anything to you about that?

A. She said she didn't—she didn't know how the injuries occurred.

Q. Did she make any statements to you about where the child had been over the past five days?

A. She stated they were with—she was with Heidi Niemic.

Q. Did she say anything to you in particular about when it was that Heidi Niemic came to take care of her child?

A. She said on the 12th of May.

Q. Did she say anything to you about her living conditions?

A. She said her conditions were not fit for a child; that there was craziness in her house, and she felt the baby was better off somewhere else.

Q. Did she say anything to you about any contact that she had had with Heidi Niemic since the time that she alleged to have given her the care of her child?

A. Yes. She said that she tried to get in contact with Heidi several times to get the baby back, but she couldn't.

Q. Did she tell you how it was that she tried to contact Heidi Niemic to get her child back?

A. She said she called her up.

Q. Did she at any point say that she went to Heidi's home to get her daughter?

A. No, I don't believe she said she went to her house.

Q. Did you say anything to her about her attempts to get her daughter back from Heidi Niemic?

A. Yes. I asked her why she didn't call the police.

Q. And what did she say?

A. She said she didn't know why.

Q. Did she say anything else to you in regards to Heidi Niemic?

A. I don't recall.

Q. Did she say anything further to you at this point about her reaction when she saw her daughter on that day?

A. Yes. She—

Mr. Coyne: Objection.

The Court: Yes. Sustained.

(Tr. I:116–19) (emphasis added). The testimony then went on to address conversations and events at the hospital.

In his charge to the jury, the trial judge did not specifically reference the stricken testimony that Isabelle had asked to see her lawyer. The judge instructed the jury as follows:

So, you're going to have to decide what the facts are solely from the evidence admitted in this case, and not from suspicion or conjecture. The evidence consists of the testimony of the eleven witnesses that you heard as you recall it and the twenty-one exhibits which were admitted into evidence.

Some things that occur during a trial are not evidence, and you may not consider them as evidence in deciding the facts of the case. The indictments themselves are not evidence. A question put to a witness is never evidence. Only the answers are evidence. *Also you may not consider any answers that I struck from the record and told you to disregard. Do not consider such answers.* Anything that you may have seen or heard when this court was not in session is not evidence. The opening statements that you heard yesterday and the closing arguments that you've just now heard from the lawyers are not a substitute for the evidence. They're only intended to assist you in understanding the evidence

and the contentions of the parties. My instructions and anything that I have said in passing during this trial are not evidence.

(Tr. II:137–38) (emphasis added).

### The Appeals Court Decision

Isabelle, through counsel, filed a timely direct appeal to the Massachusetts Appeals Court, claiming "(1) counsel was ineffective for failing to request a specific unanimity instruction; and (2) eliciting by the prosecutor of testimony from a police detective that the defendant had requested to speak with her attorney requires reversal." *Isabelle I,* 60 Mass.App.Ct. 1117, 803 N.E.2d 1288, 2004 WL 287364 (2004). These claims were rejected by the Appeals Court, which confirmed Isabelle's convictions in an unpublished opinion issued on February 13, 2004. *Id.*

As the Appeals Court held with respect to the unanimity instruction:

"[A] specific unanimity instruction indicates to the jury that they must be unanimous as to which specific act constitutes the offense charged." *Commonwealth v. Keevan,* 400 Mass. 557, 566–567, 511 N.E.2d 534 (1987). Such an instruction is required "only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged.... The possibility of disagreement exists where the defendant is accused of a number of unrelated incidents, such as alleged rapes at different times or places, leaving the jurors free to believe different parts of the testimony and yet convict the defendant." *Commonwealth v. Ramos,* 31 Mass.App.Ct. 362, 366–367, 577 N.E.2d 1012 (1991).

*Isabelle I,* 2004 WL 287364, at *1. According to the Appeals Court, such an instruction was not warranted in Isabelle's case because the facts showed "a continuing course of conduct, rather than a succession of clearly detached incidents" and, in such circumstances, "a specific unanimity instruction is not required." *Id.* (internal quotation omitted). As the Appeals Court described the testimony:

The indictment averred the wounds were inflicted "on divers dates and at divers times from on or about May 12, 1999, to on or about May 23, 1999." The defendant was unequivocal that Holly was exclusively in the care of one Heidi Niemic during that entire time. This testimony was at odds with that of Niemic who testified that Holly had stayed with her only from May 20 until May 23, in the morning, and again from the afternoon of the 23rd until the morning of the 25th. In sum, it is difficult to see how the jury could have believed different aspects of the testimony to the extent they would have disagreed on which wounds the defendant had inflicted, thereby impermissibly convicting the defendant based on different acts.

*Id.* Since there was no requirement for a unanimity instruction, the Appeals Court held that it was not ineffective assistance of counsel to fail to request such an instruction. *Id.* at *2. Finally, the Appeals Court determined that even if a specific unanimity instruction were appropriate, since no instruction had been requested, the court would review the case for a "substantial risk of a miscarriage of justice." *Id.* The Appeals Court found that there was no such risk as all the elements of the statutes charged were satisfied. *Id.*

With respect to the testimony that the defendant had requested an attorney, the Appeals Court found that "[t]here is no question the testimony should not have been elicited," especially "in light of defendant's motion in limine which identified the very question (had 'she ever harmed [the victim,] )' that would elicit the impermissible answer ('she wanted her lawyer')." *Id.*

Citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the Appeals Court then proceeded to review the case to "decide whether the record establishes 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Isabelle I*, 2004 WL 287364, at *3. While the Appeals Court had "grave misgivings concerning the prosecutor's conduct," it concluded that no new trial was necessary. It based this decision in large part on the fact that Isabelle continued speaking after she requested a lawyer, as a result of which her request for counsel did not convey the impression that she was hiding information from the police. *Id.* In addition, while the court recognized that the case was based on a test of credibility between the defendant and Niemic, it concluded that Isabelle's "single reference to her wanting her attorney, followed by her other statements to the police, did little to erode her credibility. Far more damaging were the multiple instances where jurors were forced to decide between her testimony and that of other witnesses in addition to Niemic." *Id.* Finally, the Appeals Court found persuasive the fact that there was an immediate objection and the testimony was stricken. *Id.* The Court characterized as "commendable" the final instructions which "clearly explained what is and is not evidence." *Id.* In sum, the Appeals Court found that the prosecutor's question constituted harmless error. *Id.*

### The SJC Decision

Isabelle filed an application for leave to obtain further appellate review with the Massachusetts SJC raising the same issues as those presented to this court. (See SA Ex. K). The SJC granted review "limited to the issue regarding the detective's testimony that the defendant requested an attorney." *Commonwealth v. Isabelle*, 442 Mass. 1106, 813 N.E.2d 1283 (2004) (table). On June 1, 2005, a sharply divided panel of the SJC affirmed the conviction, in a 4 to 3 decision. *Isabelle II*, 444 Mass. 416, 828 N.E.2d 53 (2005). Relying on *Doyle v. Ohio*, 426 U.S. 610, 613–19, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) and *Commonwealth v. Beauchamp*, 424 Mass. 682, 690–91, 677 N.E.2d 1135 (1997), the majority of the court held that the prosecutor's elicitation of testimony regarding Isabelle's request for counsel was improper and violated Isabelle's state and federal constitutional rights. *Isabelle II*, 444 Mass. at 419, 828 N.E.2d at 56. The court then ruled that, in light of these constitutional violations, "[i]n order for the defendant's convictions to stand, we must be satisfied that the record establishes beyond a reasonable doubt that this improper reference did not contribute to the verdicts." *Id.* at 419, 828 N.E.2d at 56–57 (citing *Commonwealth v. Peixoto*, 430 Mass. 654, 660, 722 N.E.2d 470, 476 (2000), which, in turn, cited *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). As the court ruled further:

> In making this determination and assessing the impact of a *Doyle* error, we consider the following facts: "(1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions" (footnotes omitted).

*Isabelle II*, 444 Mass. at 419, 828 N.E.2d at 57 (quoting *Commonwealth v. Mahdi*, 388 Mass. 679, 696–97, 448 N.E.2d 704 (1983)).

The majority of the court then reviewed the evidence in detail. It found significant that there was only one reference to the defendant's request for her attorney, which was immediately stricken, and that there was other, non-objectionable testimony to the effect that the defendant was on her way to see her attorney, and was

represented by an attorney in connection with her efforts to regain custody of all of her children. *Id.* at 419–20, 828 N.E.2d at 57. Under such circumstances, the court concluded that it was "likely that the defendant's reference to her attorney was not as significant to the jury as in the ordinary case where there is no evidence that an attorney is currently representing the defendant." *Id.* at 420, 828 N.E.2d at 57.

The majority also concluded that the record was "clear" that there was no deliberate prosecutorial misconduct, and relied on the fact that there was no request for a curative instruction. *Id.* The charge as given, the Court ruled, included a sufficient curative instruction. *Id.*

The court addressed the fact that the credibility of Isabelle and Niemic were of critical importance in the case, and reviewed the improper statement in that light. The majority found that the single reference to counsel followed by Isabelle's statements to the police "did little to erode [Isabelle's] credibility" and it reviewed the testimony of witnesses other than Niemic whom the jury would have had to disbelieve in order to find the defendant credible. *Id.* at 420–21, 828 N.E.2d at 57–58. In addition, the majority reviewed the other "substantial evidence of the defendant's guilt" and rejected Isabelle's argument that the evidence tended "equally to sustain either of two inconsistent propositions." *Id.* at 421, 828 N.E.2d at 58. In sum, the majority concluded "that the record establishes beyond a reasonable doubt that the improper reference to the defendant's request to speak with her attorney did not contribute to the verdicts," and, therefore, affirmed the convictions. *Id.*

Justice Sosman, joined by Chief Justice Marshall and Justice Cordy, dissented. While the dissent applied the same general legal principles, it arrived at a different conclusion based on the factual record.

Thus, the dissent, like the majority, found that the testimony violated the defendant's constitutional rights as defined by *Doyle v. Ohio. Isabelle II,* 444 Mass. at 422, 828 N.E.2d at 58. The dissent also applied the same "reasonable doubt" standard set forth in *Chapman v. California* as the majority did in reviewing the error, and applied the same factors in assessing the impact of a *Doyle* error as did the majority. *Isabelle II,* 444 Mass. at 422–23, 828 N.E.2d at 59. Nevertheless, the dissent concluded that the convictions should be reversed since "reversal is the norm, not the exception" when there is a *Doyle* violation. *Id.* at 422, 828 N.E.2d at 58 (quoting *Commonwealth v. Mahdi,* 388 Mass. at 698, 448 N.E.2d at 715).

The dissent viewed the case as a credibility battle between Isabelle and Niemic and, as such, found that "any evidence suggesting consciousness of guilt on the defendant's part would be damaging to the defense." *Id.* at 423, 828 N.E.2d at 59. The dissent characterized the reference to the request for counsel as "the only—or at least the clearest—consciousness of guilt evidence that came before the jury[.]" *Id.* at 423–24, 828 N.E.2d at 59. Moreover, the dissent objected to the majority's assessment of the evidence of guilt as being "substantial," and contended that it should be "overwhelming" before the error could be deemed harmless beyond a reasonable doubt. *Id.* at 425, 828 N.E.2d at 60. The dissent pointed to the evidence which would tend to discredit Niemic, and concluded that there was a great deal of conflicting evidence as to whose custody the child was in when she was injured. *Id.* at 425–26, 828 N.E.2d at 60–61. As Justice Sosman concluded:

> We cannot allow the rigorous standards that we apply to preserved *Doyle* errors to degrade into something akin to the substantial risk of miscarriage of justice standard that we apply to unpreserved

errors, and we certainly should not tolerate such degradation of our standards in a case where defense counsel did everything possible to prevent a *Doyle* error from occurring. Where the "norm" is to be reversal, even in the case of an ordinary *Doyle* error, see *Commonwealth v. Mahdi* [388 Mass. 679, 698, 448 N.E.2d 704 (1983)], I see no reason to make an exception for a *Doyle* error that has occurred in circumstances as egregious as these. Belief that there was "substantial" evidence of the defendant's guilt does not suffice to take this case out of that "norm." I therefore respectfully dissent.

*Isabelle II,* 444 Mass. at 429–30, 828 N.E.2d at 63–64.

As detailed above, in her timely habeas petition Isabelle raises both the issue of the reference to her request for counsel and the lack of a request for a unanimity instruction. There is no question that both claims have been exhausted and they will be addressed herein.

Additional facts will be provided below where appropriate.

### III. *DISCUSSION*

#### A. *Standard of Review*

The standard of review to be applied to Isabelle's habeas corpus petition is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under this standard, a federal habeas court may not grant a writ of habeas corpus unless the underlying state court adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2000).[5]

As the United States Supreme Court has explained with respect to the first prong:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.... The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.

*Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).

 Thus, a state court decision is "contrary to" clearly established law, as set forth in the holdings of Supreme Court decisions, if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Evans v. Thompson,* 518 F.3d 1, 4 (1st Cir.2008) (internal punctuation and citation omitted). If the state court decision was not "contrary to" federal law as defined by the Supreme Court, the habeas court must then determine "whether the state court ruling was an 'unreasonable application' of the Court's precedent." *Vieux v. Pepe,* 184 F.3d 59, 65–66 (1st Cir.1999), *cert. denied,* 528 U.S. 1163, 120 S.Ct. 1178, 145 L.Ed.2d 1086 (2000). An "unreasonable application" occurs when "the state court

---

**5.** Isabelle is not contending that the state courts made an unreasonable determination of the facts. Rather, she claims that the deci-

sions were contrary to or involved an unreasonable application of clearly established Federal law.

correctly identifies the governing legal principle" as defined by the Supreme Court cases, "but unreasonably applies it to the facts of the particular case." *Bell,* 535 U.S. at 694, 122 S.Ct. at 1850. An "unreasonable application is different from an incorrect one." *Id.* In order to reach the level of "unreasonable," "some increment of incorrectness beyond error is required." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir.2002) (en banc) (internal quotation and citation omitted). This "increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *Id.* See also *Evans,* 518 F.3d at 4 ("It is not enough that a state court decision erroneously apply clearly established law; its application must be not only wrong, but unreasonably so.") (citing *Williams v. Taylor,* 529 U.S. 362, 411, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000)).

Applying these principles to the instant case, Isabelle has failed to establish that the state courts' adjudications resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law. Therefore, this court recommends that Isabelle's habeas petition be denied.

### B. The Reference to the Request for Counsel

### 1. There was no Constitutional Violation under Federal Law

■ In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle,* 426 U.S. at 619, 96 S.Ct. at 2245. The Court reasoned that *Miranda* warnings contain an implicit assurance that the exercise of the right to remain silent would not result in any penalty, and, therefore, that "it would be fundamentally unfair and a deprivation of due process" to use the arrested person's silence against them. *Id.* at 618, 96 S.Ct. at 2245. It is well established that *"Doyle* also protects a defendant's request for a lawyer because the right to an attorney is encompassed within the Miranda warnings, and a claim of that right should not carry any adverse consequences." *Commonwealth v. Peixoto,* 430 Mass. 654, 657, 722 N.E.2d 470, 473 (2000). *Accord United States v. Daoud,* 741 F.2d 478, 480 (1st Cir.1984), and cases cited.

In the instant case, both the Appeals Court and the SJC found a constitutional violation in connection with the questioning that led to the statement that Isabelle had requested a lawyer.[6] This conclusion was generous to Isabelle. Under clearly established federal law as set forth by the United States Supreme Court, one reference to a request for counsel, which is promptly stricken without fanfare, does not rise to the level of a constitutional violation where, as here, the matter is not pursued by the prosecutor and the court gives an appropriate jury charge limiting the jury's consideration to matters properly in evidence.

---

6. While the Appeals Court did not expressly find a constitutional violation, as opposed to a violation of the court's ruling on the pre-trial motion in limine, the Appeals Court then analyzed the harm under *Chapman,* a case setting forth the standard of review for constitutional violations. The SJC expressly found a violation of the defendant's state and federal constitutional rights. There is some indication in the case law that the Massachusetts Constitution may afford greater protection in this area than the Federal Constitution, but that issue need not be decided here. See *Commonwealth v. Chase,* 70 Mass.App.Ct. 826, 832, 877 N.E.2d 945, 951 (2007), and cases cited.

The legal principles that are controlling in the instant case are those defined by the Supreme Court in *Greer v. Miller,* 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). In *Greer,* the prosecutor cross-examined the defendant by asking "Why didn't you tell this story to anybody when you got arrested?"—a clear violation of the defendant's right not to suffer adverse consequences for invoking his right to remain silent. *Id.* at 759, 107 S.Ct. at 3105. Defense counsel objected and the answer was stricken, with the jury being instructed to "ignore the question, for the time being." *Id.* The prosecutor did not pursue the line of questioning, nor did he raise it in his argument. *Id.* The only reference in the jury charge was the judge's instruction to the jury to "disregard questions ... to which objections were sustained." *Id.*

The Supreme Court found that there was no violation of the defendant's constitutional rights. As the Court explained, "the holding of *Doyle* is that the Due Process Clause bars 'the *use* for impeachment purposes' of a defendant's postarrest silence" and that "it does not comport with due process to *permit* the prosecution during trial to call attention to the defendant's silence." *Id.* at 763, 107 S.Ct. at 3108 (emphasis in original) (punctuation and citation omitted). Thus, the Court determined that *Doyle* is applicable where "the trial court has permitted specific inquiry or argument respecting the defendant's post-Miranda silence." *Id.* at 764, 107 S.Ct. at 3108. The facts of *Greer,* like the facts of the instant case, however, were significantly different. As the *Greer* Court held:

> In contrast to these cases, the trial court in this case did not permit the inquiry that *Doyle* forbids. Instead, the court explicitly sustained an objection to the only question that touched upon Miller's postarrest silence. No further questioning or argument with respect to Miller's silence occurred, and the court

specifically advised the jury that it should disregard any questions to which an objection was sustained. Unlike the prosecutor in *Doyle,* the prosecutor in this case was not 'allowed to undertake impeachment on,' or 'permitted to call attention to,' Miller's silence.... The fact of Miller's postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case.

*Id.* at 764–65, 107 S.Ct. at 3108 (internal citation and punctuation omitted).

The instant case presents substantially identical facts to *Greer.* The defendant's objection to the prosecution's question was promptly sustained, the matter was not pursued further and no evidence of Isabelle's exercise of her constitutional rights was submitted to the jury. Accordingly, there was no *Doyle* violation. *See, e.g., Ellen v. Brady,* 475 F.3d 5, 10, 12–13 (1st Cir.2007) ("Mere reference to a defendant's post-*Miranda* silence does not necessarily amount to a due process violation." No *Doyle* violation where there was a single reference to defendant's election to remain silent and a curative instruction given). *Accord United States v. Andujar-Basco,* 488 F.3d 549, 559–560 (1st Cir. 2007). Since there was no violation of Isabelle's federal constitutional rights, this court recommends that Isabelle's petition for habeas relief be denied.

### 2. Assuming a Constitutional Violation, the State Courts' Decisions Were Not Contrary to or an Unreasonable Application of Federal Law

Even assuming that there was a violation of Isabelle's federal constitutional rights by the question eliciting her request for counsel, the state court decisions were not contrary to or an unreasonable applica-

tion of federal law. Therefore, Isabelle's habeas petition should be denied.

■■■ "Where, as here, the defendant timely objected to the impermissible testimony regarding his exercise of the right to [counsel]," the state appellate court must decide "whether the record establishes 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Commonwealth v. Chase*, 70 Mass.App.Ct. 826, 833, 877 N.E.2d 945, 952 (2007) (quoting, *inter alia, Chapman*, 386 U.S. at 24, 87 S.Ct. at 828). This is the standard that was applied by both the Appeals Court and SJC in the instant case. *See Isabelle I*, 2004 WL 287364 at *3; *Isabelle II*, 444 Mass. at 419, 828 N.E.2d at 56–57. In reviewing these state decisions in connection with a habeas petition, however, this court is to apply the standard established by *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), which requires an evaluation as to whether the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Delaney v. Bartee*, 522 F.3d 100, 105 (1st Cir.2008) (quoting *Brecht*, 507 U.S. at 631, 113 S.Ct. at 1718). *See also Petrillo v. O'Neill*, 428 F.3d 41, 44–45 (1st Cir.2005), *cert. denied*, 547 U.S. 1117, 126 S.Ct. 1920, 164 L.Ed.2d 672 (2006) ("On direct appeal, a state court confronted by a preserved constitutional error must set aside the judgment unless it is satisfied that the error was harmless beyond a reasonable doubt.... A federal habeas court is bound to uphold a state court judgment as long as the error did not have a 'substantial injurious effect on the jury's verdict'") (quoting *Brecht*, 507 U.S. at 638, 113 S.Ct. at 1722) (additional citations omitted). Under this "less onerous standard," "habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 638, 113 S.Ct. at 1722. Moreover, contrary to the dissent's opinion in *Isabelle II*, the evidence of guilt does not have to be "overwhelming"—"weighty" evidence of guilt will suffice if "in light of the record as a whole" the habeas court concludes that the admission of impermissible testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 638–39, 113 S.Ct. at 1722 (finding petitioner was not entitled to habeas relief despite *Doyle* violation where "the State's evidence of guilt was, if not overwhelming, certainly weighty").

■■■ In the instant case, even assuming there was a *Doyle* error, it did not "substantially influence" the jury's verdict. As an initial matter, there was only a single reference to a request for an attorney, which was promptly stricken.[7] The matter was not pursued in any form, and the jury was not asked to consider the meaning or intent of the request for counsel. Moreover, Isabelle did continue to answer substantive questions about what had occurred, negating any inference that she was trying to hide something by asking for counsel. In addition, the jury was aware that Isabelle had a lawyer and was working with a lawyer to gain custody of her children. Therefore, the introduction of a lawyer would not be shocking to the jury.

Moreover, the evidence certainly was "weighty," and, in this court's view, could have been found "overwhelming" in favor of a guilty verdict. The evidence was reviewed in detail by the Appeals Court and the SJC, and those courts' analyses do not

---

7. Furthermore, in the jury charge the trial judge instructed the jurors to disregard all evidence that was stricken. Juries are presumed to follow instructions to disregard testimony. *See Ellen*, 475 F.3d at 13, and cases cited.

have to be repeated in detail herein. As the majority of the SJC concluded:

> this is not a case where the evidence tends equally to sustain either of two inconsistent propositions. Rather, there was substantial evidence of the defendant's guilt. In addition to the challenges to the defendant's version of events, there was other evidence that the jury could have considered. For example, after the victim was returned to her, the defendant refused to let employees of the department see the victim until a court ordered her to produce the victim. There was also evidence that the defendant smoked cigarettes but no evidence that Niemic or anyone in her house did, which may have had some relevance to the cigarette burns on the victim. The defendant testified that she was unable to keep her household together as she had no electricity and no food. Additionally, both the police and department's employees testified that the defendant had no interest in the victim's injuries.

*Isabelle II*, 444 Mass. at 421–22, 828 N.E.2d at 58.

Finally, to the extent that the case came down to a credibility dispute, the improper question and answer did not substantially contribute to the verdict. The jury had to evaluate the credibility of a number of witnesses. They had the opportunity to observe Isabelle and Niemic, as well as a number of others. The jury had a wealth of information from which to base their credibility assessment. This court agrees with the Appeals Court and the majority of the SJC that "a single reference to [Isabelle's] wanting her attorney, followed by her other statements to the police, did little to erode her credibility." *Isabelle I*, 2004 WL 287364 at \*3; *Isabelle II*, 444 Mass. at 420, 828 N.E.2d at 57.

Even if this court were to review the case under the *Chapman* "harmless error"

standard, the state courts' decisions were not contrary to or an unreasonable application of federal law. The state courts applied the appropriate *Chapman* standard of review. Their decisions upholding the guilty conviction were consistent with the law as applied by the Supreme Court in other cases such as *Greer*, discussed *supra*. *See also Brecht*, 507 U.S. at 639, 113 S.Ct. at 1722–23 (where the state's evidence of guilt was "weighty" and the "references to petitioner's post-Miranda silence were infrequent," court concludes "that the *Doyle* error that occurred at petitioner's trial did not 'substantially influence' the jury's verdict" and petitioner was not entitled to habeas relief) (punctuation omitted). They were consistent with other federal cases as well. *See, e.g., Booton v. Hanauer*, 541 F.2d 296, 298–99 (1st Cir.1976) (constitutional error caused by introduction of petitioner's eventual refusal to answer further questions was harmless beyond a reasonable doubt where the introduction of such evidence was "neither a dramatic nor a telling event[,]" the "posture of the questioning was not accusatory[,]" "the testimony was not calculated to damage a point upon which a defense was being constructed," and "there was no comment (direct or indirect) on this point by the prosecutor"); *United States v. Ruz–Salazar*, 764 F.2d 1433, 1437 (11th Cir.1985) (single reference at trial to defendant's silence was harmless beyond a reasonable doubt). *Accord Chase*, 70 Mass.App.Ct. at 836, 877 N.E.2d at 954, and cases cited.

Finally, the fact that the minority of the SJC viewed the record differently does not alter this court's conclusion. Since the SJC applied the correct Supreme Court decisions, the issue raised by the existence of the dissent is whether the majority unreasonably applied the governing legal principles to the facts before it. *See Williams*, 529 U.S. at 413, 120 S.Ct. at

1523. As an initial matter, the minority of the SJC sought to apply a higher standard than "substantial evidence" of guilt. *Isabelle II*, 444 Mass. at 422, 828 N.E.2d at 58-59. However, this higher standard is not required under federal law. *Brecht*, 507 U.S. at 638-39, 113 S.Ct. at 1722 (rejecting requirement that evidence of guilt must be "overwhelming"). Moreover, as noted above, it is not enough that a state court decision erroneously apply clearly established law; its application must be not only wrong, but unreasonably so. *See Williams*, 529 U.S. at 365, 120 S.Ct. at 1499. In the instant case, this court does not find that the majority of the SJC erroneously applied clearly established law. Even if it did, however, in light of the majority's careful analysis, this court cannot find that the majority's application of the law was unreasonable.

For all these reasons, this court recommends that Isabelle's petition for habeas relief based on the questioning which disclosed her request for counsel be denied.

### C. The Need for a Unanimity Instruction

 Isabelle argues that a specific unanimity instruction was warranted because the indictments charged separate instances of conduct that occurred on different days so that it was likely the jury could have disagreed as to which instances constituted the criminal conduct. (*See* Pet. Mem. at 40). She argues that there was a potential for juror confusion at trial and that trial counsel's failure to request the warranted instruction deprived her of effective assistance of counsel. (*See id.*). This argument was properly rejected by the Appeals Court, and it provides no basis for granting a writ of habeas corpus.

 A specific unanimity instruction indicates to the jury that "they must be unanimous as to which specific act constitutes the offense charged." *Commonwealth v. Keevan*, 400 Mass. 557, 566-567, 511 N.E.2d 534, 540 (1987). The Appeals Court found that no such instruction was needed under Massachusetts law. *Id.* at 567, 511 N.E.2d at 541. *See also Commonwealth v. Medina*, 64 Mass.App.Ct. 708, 717 n. 14, 835 N.E.2d 300, 310 n. 14 (2005) ("The right to a specific unanimity instruction is derived from [Massachusetts] common law and is not a constitutional requirement."). It appears that the Isabelle court correctly applied Massachusetts law. *See id.* at 718, 297 Ill.Dec. 823, 838 N.E.2d at 311 (No need for specific unanimity instruction as there was no risk of jury confusion where the crimes arose from a repetitive pattern of sexual abuse). In any event, it is well established that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 765, 110 S.Ct. 3092, 3094, 111 L.Ed.2d 606 (1990). Thus, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991).

 To the extent that the defendant's claim is to be reviewed under federal law in connection with this habeas petition, it is beyond dispute that "a state criminal defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict." *Schad v. Arizona*, 501 U.S. 624, 634 n. 5, 111 S.Ct. 2491, 2498 n. 5, 115 L.Ed.2d 555 (1991), and cases cited. *Accord Casella v. Clemons*, 207 F.3d 18, 20 (1st Cir.2000), and cases cited. Thus, under federal law "[a] special unanimity instruction is required only where there is a genuine risk of juror confusion or of conviction resulting from different jurors con-

cluding the defendant committed different acts." *United States v. Sayan,* 968 F.2d 55, 65 (D.C.Cir.1992). However, "[i]n most cases a general instruction on unanimity suffices." *Id.* at 65–66. *See also Commonwealth v. Conefrey,* 420 Mass. 508, 514 n. 10, 650 N.E.2d 1268, 1272 n. 10 (1995) (citing numerous federal courts of appeal cases holding that general unanimity instruction is sufficient unless "there exists a genuine possibility of juror confusion."). In the instant case, there was no possibility of confusion. As the Appeals Court recognized, the jury could either find that the victim's injuries were caused while she was in Niemic's care or in Isabelle's care— "it is difficult to see how the jury could have believed different aspects of the testimony to the extent they would have disagreed on which wounds the defendant has inflicted[.]" *Isabelle I,* 2004 WL 287364 at *1.

Moreover, as the Appeals Court held, the case presented to the jury was that of a continuous course of abuse over a period of time. Under such circumstances, many states do not require that the jury obtain unanimity on specific abusive actions. *See generally Richardson v. United States,* 526 U.S. 813, 821–22, 119 S.Ct. 1707, 1712, 143 L.Ed.2d 985 (1999) (acknowledging that many state courts interpreting statutes making criminal such crimes as sexual abuse of a minor permit a jury to disagree

about a "specific" underlying criminal "incident" and insist "only upon proof of a 'continuous course of conduct' in violation of the law."). It is not a violation of a defendant's federal constitutional rights to be convicted of such a state crime. *See id.*

In sum, since there was no basis for a specific unanimity instruction, there is no basis for the defendant's claim of ineffective assistance of counsel for failure to request such an instruction. *See Vieux v. Pepe,* 184 F.3d at 64 ("Obviously, counsel's performance was not deficient if he declined to pursue a futile tactic."). The state court decision denying Isabelle's claim of ineffective assistance of counsel was not contrary to or an unreasonable application of federal law.

## IV. CONCLUSION

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Isabelle's Petition for Habeas Corpus be DENIED.[8]

June 6, 2008.

*Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–05 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).

---

8. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*